UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DEQUAN WIGGINS,** | Crim. No. 21-926 (WJM)<br><br><br><br>**OPINION** |

<u>**WILLIAM J. MARTINI, U.S.D.J.**</u>

This matter comes before the Court on the motion of Defendant Dequan Wiggins ("Defendant") to suppress evidence. ECF No. 35. An evidentiary hearing was held on October 24, 2022. For the reasons set forth below, Defendant's motion to suppress evidence is **denied.**

### I.     BACKGROUND

Defendant, in support of his motion to suppress, submitted an Affidavit claiming that police officers initially approached him in his legally parked vehicle with flashlights shining and their guns drawn. Def.'s Aff. in Supp. of Pretrial Mot., ¶ 2. Because that assertion raised issues of material fact as to whether officers had reasonable suspicion to conduct an investigative stop, the Court granted Defendant's motion for a suppression hearing in an Opinion dated October 18, 2022. ECF No. 37. During the hearing, the Government presented the testimony of Detective Marc Castro, which the Court found to be straightforward and credible notwithstanding minor and immaterial inconsistencies highlighted by defense counsel.[1] Defendant presented the testimony of Quadri Fleming ("Fleming"). To the extent that any portion of the finding of facts set forth below differs from those alleged by Defendant, it is the result of the determinations as to credibility, relevance, and the weighing of evidence.

On or about December 18, 2020 at about 5:10 PM, Defendant was seated in the driver's seat of a blue Jeep Cherokee with a Pennsylvania license plate ("Jeep"). Detectives

---

[1] At a motion to suppress hearing, "'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" *United States v. Folks*, 452 F. Supp. 3d 238, 249 (W.D. Pa. 2020) (citing *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007); *United States v. Pappas*, 735 F.2d 1232, 1233 (10th Cir. 1984).

Marc Castro and Steven Resendes were in an unmarked police vehicle patrolling an area in Newark with open narcotic dealings when Det. Castro saw the Jeep parked with its engine running and no lights on. Newark Police Incident Report, Def.'s Br. in Supp. of Mot. to Suppress, Ex. A; Compl., Attachment B. At the hearing, Det. Castro explained he could see that the Jeep was idling because of the car exhaust fumes were visible given that it was a cold day. It was dark outside, but the Jeep was parked directly under a streetlight and as they were slowly passing it, Det. Castro used his flashlight to further illuminate the Jeep. He noticed the driver of the Jeep, later identified as Defendant, lean back into his seat in what Det. Castro believed was an attempt to get out of view. The passenger, later identified as Fleming, was behaving similarly. Det. Castro also observed that the front windshield was cracked. *See* GX-2; Motor Vehicle Summons, GX-3.

Det. Castro exited his vehicle to investigate and approached the Jeep driver's side illuminating the windshield with his flashlight. He saw Defendant remove a piece of black baggy-like plastic from his right pants pocket. Defendant, stating that he had only a few pills on him, opened the package to reveal three pills, which were later found to be Endocet, a controlled substance. Det. Castro asked Defendant to step out of the Jeep, placed him under arrest for possession of the pills, and then walked him to the rear of the Jeep. Det. Resendes asked Fleming to step out and relinquished him to another officer for further questioning.

Once Defendant and Fleming were out of the Jeep, Det. Castro explained that he illuminated the interior of the car using his flashlight and observed another green pill, suspected to be "ecstasy" inside of the cup holder. Upon search of the Jeep interior, police found a handgun in the compartment behind the dashboard in the Jeep. Defendant told police that the gun belonged to him rather than to Fleming. Later, when law enforcement was rendering the gun to be safe, another green pill suspected to be ecstasy was found in the barrel of the firearm, a .9mm semiautomatic pistol loaded with seven rounds of ammunition.

## I.   DISCUSSION

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. Amend. IV. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Defendant argues that he was unlawfully seized when without any reasonable suspicion, detectives drew their guns, ordered him to exit his vehicle, and conducted a pat down. Defendant claims that before he was arrested, officers unlawfully searched him and his vehicle. Accordingly, Defendant seeks to suppress the firearm seized from his vehicle.

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant

establishes a basis for his motion, the "burden shifts to the government to show that the search or seizure was reasonable." *Id*. The government must prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

### A. Reasonable Suspicion

The legality of the seizure under *Terry v. Ohio*, 391 U.S. 1 (1968) is determined by "whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity." *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) (citing *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)). "In evaluating whether reasonable suspicion existed, a court 'must consider the totality of the circumstances, including the police officer's knowledge, experience, and common-sense judgments about human behavior.'" *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). "Courts give considerable deference to police officers' determinations of reasonable suspicion." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

To show that the police stopped Defendant without any reasonable suspicion, defense witness Fleming testified that police cars suddenly blocked the Jeep in and approached their vehicle with flashlights drawn. Fleming also testified that police ordered them to roll down the windows, that Defendant refused to do so and showed police his identification through the closed car window. According to Fleming, Defendant admitted to possession of the pills after exiting the Jeep. Both individuals were then handcuffed. As explained by Fleming, he was not arrested that day because Defendant told police anything they found was his. Defendant's exculpatory statements may thus have motivated Fleming to testify on Defendant's behalf.

However, nothing in Fleming's testimony materially conflicts with or puts into dispute that there was reasonable suspicion to conduct an investigatory stop based on Det. Castro's observations of suspicious movements in a high crime area and the cracked windshield on the Jeep, which is a technical violation of New Jersey Motor Vehicle Code 39:3-74.[2] The decision to stop an automobile is generally a reasonable "seizure" where the police have reasonable suspicion of a traffic violation, even if the ultimate charge is not related to the traffic stop. *See Whren v. United States*, 517 U.S. 806-810 (1996); *Mosley*, 454 F.3d at 252 (noting that in *Whren*, "the Supreme Court established a bright-line rule that *any* technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." (emphasis added)). As Det. Castro

---

[2] New Jersey Motor Vehicle Code 39:3-74 provides: "[n]o person shall drive any vehicle so constructed, equipped or loaded as to unduly interfere with the driver's vision to the front and to the sides."

3

explained, he could see the crack because the Jeep was parked directly underneath a streetlamp and as they passed, he illuminated the Jeep with his flashlight. To the extent that the driver and passenger windows may have been tinted as Defendant suggests, it is evident that any such tinting was minimal and did not prevent Det. Castro from being able to see the Jeep interior. Even Fleming explained that the police were using a flashlight and could see Defendant's identification through the closed Jeep window. Moreover, Government Ex. 200, which is the only relevant picture of the Jeep as it was taken on the night of Defendant's arrest, shows that the Jeep passenger window was see-through. Although Defendant introduced into evidence photographs of the Jeep taken many months prior to December 18, 2020 as well as some taken as recently as a few days prior to the evidentiary hearing, *see* Def. Exs. 1-6D, those lack any probative value as to the Jeep's features on December 18, 2020. Why the Government even stipulated to allow such photographs into evidence is beyond the Court's understanding.

In addition to the traffic violation, Det. Castro testified that he also observed Defendant's furtive movements, which contributed to the officers' reasonable suspicion that criminal conduct was afoot. *See United States v. Harrison*, 2018 WL 4405892, at *8 (E.D. Pa. Sept. 17, 2018) ("suspect's furtive movements can contribute to an officer's reasonable suspicion that criminal activity is afoot"). Moreover, the Jeep was idling in an area with a surge of gun violence and narcotics activity. *See Wardlow*, 528 U.S. at 124 ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

Finally, on the critical issue of whether police conducted the stop with guns drawn, Det. Castro credibly testified that the police did not approach the Jeep with guns drawn. Significantly, that testimony was confirmed by Fleming. Indeed, consistent with Det. Castro's experience, most traffic violation stops do not involve approaching a vehicle with guns drawn. Here, nothing about this particular traffic stop would have triggered a heightened sense of danger to prompt law enforcement to stop the Jeep with guns drawn. Had they had done so, officers may have placed themselves in greater peril since they were wearing plainclothes and driving in an unmarked police vehicle in an area known to have increased gun and narcotics activity.

## B. Investigatory Stop

"[O]nce a car has been legally stopped, the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants." *Mosley*, 454 F.3d at 252 (citing *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)). Even if, as Defendant contends, officers immediately ordered him to exit the vehicle, that intrusion into a driver's personal liberty has been described as *de minimis* and a "mere inconvenience" when "balanced against legitimate concerns for the officer's safety" even during a stop for a traffic violation. *Pennsylvania v. Mimms*, 434 U.S. 106,

4

111 (1977). Thus, officers, in the scope of a valid investigatory stop under *Terry*, were permitted to order Defendant to exit the Jeep, ask questions, and to conduct a visual inspection of the Jeep interior. In the course of those events, Defendant does not contest that prior to search of the vehicle, he admitted to possessing Endocet or Percocet pills, for which he was arrested. In addition, Det. Castro observed another green pill inside of the cup holder, which Defendant has also not refuted.

### C. Search of Person

Defendant argues that he was searched in violation of his constitutional rights. However, Defendant has not shown that his arrest was without probable cause and "[i]t is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. ... [A] search may be made of the person of the arrestee by virtue of the lawful arrest." *United States v. Robinson*, 414 U.S. 218, 224 (1973). In any event, only "[e]vidence obtained as a *direct* result of an unconstitutional search or seizure is plainly subject to exclusion." *Segura v. United States*, 468 U.S. 796, 804 (1984) (emphasis added). Hence, whether the search of Defendant's *person* was unconstitutional is of no moment since Defendant seeks to suppress the firearm that directly resulted from search of his *vehicle*.

### D. Search of Vehicle

Although Defendant's Affidavit stated that the arrest occurred *after* the search of the Jeep, the Court credits Det. Castro's testimony that Defendant was arrested *prior* to the vehicle search given that Defendant admitted to possessing the pills. An automobile search incident to arrest is constitutional (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or (2) "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (citation omitted); *Davis v. United States*, 564 U.S. 229, 234–35 (2011). Under the automobile search incident to arrest doctrine, police knew that Defendant possessed the pills in the black baggy-like plastic and also observed what appeared to be "ecstasy" in the cup holder. Thus, officers had reason to believe that the Jeep may contain additional evidence related to illegal drugs.

## II.    CONCLUSION

For the foregoing reasons, Defendant's motion to suppress the firearm seized from his vehicle is **denied.** An appropriate Order accompanies this Opinion.

Dated: October 27, 2022

WILLIAM J. MARTINI, U.S.D.J.

5